Good afternoon. Pleased to be seated. How are you, Mr. Goldberger? Very well, thank you. Good to see you. Likewise. Whenever you're ready, counsel. Thank you. May it please the court, my name is Peter Goldberger and it is my privilege this afternoon to represent Abdul West, who is one of the four appellants whose cases you'll be hearing in the next few minutes. Collectively, we would like to reserve three of our 25 minutes for rebuttal. Not sure who will give the rebuttal, depending on how things go. To be determined, I guess. That will leave me with eight minutes of the 22 for the two points from the issue letter that relate most closely to my client. And we submitted a division of argument that highlights who would address what. So my two points are whether the evidence of the Johnson murder was intrinsic, as Judge Belson ultimately ruled, thus obviating any Rule 404B analysis. And second, what was the significance of the trial court's failure to articulate a Rule 403 balancing before admitting the murder evidence, along with the related objected to evidence in the form of rap videos and lyrics. So this court's landmark decision in green established a very narrow definition of what counts as intrinsic evidence, and which, of course, once that label is applied, the evidence is exempted from Rule 404B analysis that is otherwise required, and from the requirement to give a limiting instruction. I'm sorry, did you? But not from 403. 403 still. Then either way, whether it be intrinsic, extrinsic, 404B, still the court has to do the 403 analysis, which I think we'll be talking about more on the second part of my argument, although, of course, I'll go to it anytime you like. Green was founded on Judge Ambrose's opinion in Cross, Judge Becker's opinion in Gibbs, and that line of authority comes ultimately to the rule that for evidence to be intrinsic, it must either directly prove a charged offense or that it be criminal conduct performed contemporaneously with the charged offense and which facilitated the commission of the charged crime. I'm assuming the governor's going to lead on to that. Well, their brief doesn't, but I think they may. All right, so in that one of the co-conspirators ordered the murder, and it was contemporaneous to the drug conspiracy, and it proved the hierarchy of the organization. Does that make it intrinsic? So that's their theory on, I guess, on why it's intrinsic. First of all, Judge Bailson never said. I mean, he went back and forth over a period of many days. So no, that's true. Would that make it intrinsic? And our argument, it is not because it does not prove the existence of the charged drug conspiracy or that more precisely the theory of the indictment that the OBH organization was not a music producing company or was not only a music producing company, but also a front for a drug distribution conspiracy. It was no more consistent with advancing the interests of the rap music company, which unfortunately we've seen in the news is sometimes done by violence against rival companies than the drug conspiracy. It has no tendency to prove the existence of a drug conspiracy or this drug conspiracy. What about Donta Stewart's testimony? Well, that's right. Donta Stewart, who cooperated and was the shooter, said he was the shooter, and presumably we take it he was. Right. What about his testimony in particular? That Mr. West ordered him to conduct the shooting to essentially further the interests of the drug conspiracy. And so do you have any authority that it was problematic to admit that as intrinsic evidence? That to advance the interests of the drug conspiracy, if that's the interpretation you would put on Stewart's testimony, I think just what he said was just to show you that you can't deal with our rivals. Right. Which would be consistent with the music business theory as well. But anyway, that's the government's theory. It doesn't that's that shows that it was inextricably intertwined, which is exactly the kind of evidence that the court rejected in Green is that for it to be intrinsic, it must directly prove the commission of the charged offense, not have something to do with the charged offense. Like prove the role in the government, for example, that it was to prove who was higher up in the conspiracy hierarchy. So, I mean, a confession or an admission would be intrinsic evidence of it, right? If someone were to say I... Of an element or several elements of the offense. Sure. Okay. How is this unlike an admission to, assuming that it happened, an admission to Mr. Stewart that this killing is happening to further the interest of the conspiracy or the organization? Well, our position is that that would show it to be inextricably intertwined with, but it would not show the existence of the... Mutually exclusive. In other words, it could be, in fact, I would imagine often is, not only intrinsic to, but also inextricably intertwined with. One does not exclude the other, does it? If something... Oh, no, of course. I mean, if it directly proves the offense, it's necessarily intertwined with the offense. But I think the intertwined is kind of a merely intertwined and not directly proving. But it doesn't prove that there was an agreement to sell drugs. It does not prove that this, that OVH was a drug conspiracy rather than or in addition to being a music company. That's the direct... That would be direct proof. Would it be intrinsic as to West's involvement in a drug conspiracy, forgetting about the other defendants? The fact that he ordered someone to kill someone who was purportedly a rival drug dealer was selling for someone else. So it's selling without authorization. To prove that he was a member of the conspiracy. The leader of it. Well, whether he's the leader or not isn't important to whether the conspiracy exists and he's a member of it, which is the... But it would be intrinsic as to West's position in the conspiracy though, wouldn't it? Again, that's one of the things that the government argues, yes. And it shows that West had the ability to give a directive to Stewart for whatever purpose. But that doesn't prove the existence of the conspiracy to sell drugs or that OVH was such a conspiracy rather than only being... I mean, you have to draw the line to make some distinction. Whatever the line was that the court was drawing in green, way over to exactly proving the elements of the offense as opposed to being inextricably intertwined, which is the point of the holding. You have to resist all of these questions about... But that's all about the conspiracy. Yeah. I mean, questions that are near the line here are always going to be about the conspiracy. How is this different from United States versus Gibbs? That's one of the cases that the government relied on in its brief. And where a witness who wasn't a defendant testified to some conversations he had with a defendant about trying to kill somebody. It predates green by several years. It's one of the foundations that leads to green. But it didn't articulate and enforce the same rule. It's more generous to the government than green. Is that Gibbs was modified by... Yes, yes. Refined and narrowed. And my red light is on. I would like to speak to the 403 if I may. Sure. So, of course, if the evidence was not intrinsic, then you don't get the 404B at all. Whether or not it's intrinsic, as Your Honor already pointed out, we still have to look at a 403 question. This Court's cases on the question that's posed in the issues letter, it turns out when I focus myself on that question, turn out to be actually at variance with each other. There are different lines of interesting cases in the Third Circuit. It's quite complex. There are the leading cases, the earliest cases, Pinney and Sampson from 1992, suggest that upon determining that the trial court did not do a 403 balancing, this Court simply reversed. Just right for that reason alone with no further analysis. But that doesn't seem to be... I missed the first part of what you said. Sorry? I missed the first part of what you said. So the earliest cases that pose the question, when the District Court fails to do any 403 balancing, just makes a conclusory statement, as the Court did here. This Court cannot review as it ought to for abuse of discretion and will simply reverse. So that happened in two early cases, Pinney and Sampson in 1992. But the mid-90s, the Court was... We do our own balancing though. Exactly. So in the mid-90s, you'd see a couple of cases where the Court says, wait, if the record allows in that situation we can do, we can exercise appellate remedial discretion. We don't have to, but we may do our own balancing. And it seems that that happens in cases where it is very clear that there's only one right answer to the balancing. So you have Himmelright and Murray, where the Court went ahead, did its own balancing and reversed. Because it was clear that the 403 ought to come out in the defendant's favor. Then there are a couple... But there's Repak a little more recently, where the Court did the same thing, found the record, no balancing by the District Court, exercised its, say, Murray discretion, you might say, and affirmed, found the balancing clearly favored the government. But then there... I'm sorry. What if we just assume that this evidence should have been kept out? And it should have been a 403 balancing on the record. That didn't happen. Let's assume that it should have been kept out. What about all the other evidence against your client specifically regarding, well, that actually leads me exactly to what I was going to say. There's another smaller line of cases, which may actually theoretically be more correct, which is maybe this Court shouldn't do its own balancing, but upon finding the error, the question arises, is the error harmless? Which is kind of the answer to your question, Judge Freeman, right? So the Court ought to ask, was this error a harmless error? But that will be a result that is less favorable to the government, even than looking at doing, and then any form of doing your own discretionary balancing. Less favorable to the government as to all the defendants or just to everyone but West? Oh, I think to all, because the question then is, can you say with confidence that the verdict of guilt by the jury was unaffected by hearing this evidence that should not have been heard, this whole body of inflammatory evidence? Not was there other evidence, but was the jury surely unaffected by hearing day after day, repeatedly, in the opening and in the closing by the government, such an evidence that is so inflammatory, necessarily inflammatory? Was it most prejudicial to West? Of course. But was it prejudicial to all the defendants? Absolutely. But the jury certainly could have been affected. But I think the question that we would ask is, if the jury hadn't heard any of that, given all of the surveillance videos and all of the, you know, the inculpatory evidence from other members of the organization, like, are we confident that they would have convicted anyway? And so what's your best pitch for why there was prejudice from the admission of that additional evidence? Because in excluding this evidence, if you can even imagine excluding all of this evidence entirely, would they have convicted of each defendant on every count? Well, your client specifically. I mean, well, I'm looking, honestly, I'm looking at the harmless error argument, the way it's articulated in the test. Can you say with a fair inference that the jury was not affected? I don't think imagining a counterfactual trial with none of this evidence at all, would we expect a purely rational jury to convict? I can't identify a particular weakness in the government's case that would say no to that case, because the jury was so surely affected. That's why the government uses the evidence, because they were so confident that they had a case without it. Why would they risk this controversy that went on and on every day? They felt, I trust the prosecutors, they felt this was important to their case, and they probably were right. They were right. And without that evidence, I'm not prepared to say the jury in a fair and untainted trial would have convicted. Why don't you spend some time on the rap videos? Oh, by all means. I'm sorry not to see it on the issues list. So our argument on that is a 403 argument that the judge allowed the defense to present on the eve of trial an expert witness whose testimony informed the question of whether this evidence was more unfairly confusing and thus a waste of time and distracting than its probative value and explained in very fair and measured terms that no one, no expert such as himself, Professor Cooper, or certainly any layperson, could say from listening to many rap videos and songs, and particularly these, whether it was confessional or a dramatic persona. We're only talking about these. Yes. There was a specific reference in one of those videos to a homicide that was committed, and it was contemporaneous to the rap. No, it's four days after. Oh, right. Four days after. But the government offered, and this is one of our principal points, the government offers no evidence. They just assume it's confessional. Their argument is it's probative because it's confessional. Argument is the expert who the judge found to be credible says no one can say that it is confessional from the video itself or from the lyrics themselves. You need extrinsic evidence to answer that question. And they offered no, no evidence of how well known the fact of this murder or its circumstances became in the community during the three or four days between the occurrence and the release of the song and the date when the lyrics are found on his phone, which would be the earliest date, right? So is he writing about something that people are talking about on the street and he realizes is a great idea for a rap in the style that he writes in? Or is it for some crazy reason he's decided to confess to the world that he did this murder? I'm assuming the government's going to argue the crazy reason would be to send a message. Oh, the murderer is supposed to send, supposedly, according to Stewart, is supposed to send the message. But in any event, the point is the exact testimony, the uncontradicted evidence to under, you might say, under rule 103, right? To inform the evidentiary decision under rule 403 is that this evidence is more distracting and confusing than probative by its nature, unless there is outside evidence to tell you to answer the critical question that the government, which is the rabbit that the government is putting in the hat. So is this argument reliant on your argument that Donta Stewart's testimony should not have been admitted? Because that seems like the corroborating link, right? Between the, we have Stewart saying, West ordered me to commit this murder. Then we have the lyrics saying, I committed this murder. And if you put them together, then you could say that the lyrics are confessional. See, then the question is whether it's, and then you'd still have how probative is it of the offense. I mean, the government's brief says in their harmless error section that the evidence wasn't, was not probative at all. So any error was harmless. So they're kind of, it seemed in that point to be agreeing with me that the commission of the error, of the murder is tangential to proving the offense. And you still have a 403 balancing. Of unfair prejudice, potential confusion of the issues against its probative value of the charge defense. Because the murder is not the charge defense. The question is whether it's, what's its probative value of the existence of the drug conspiracy. And of this particular drug conspiracy, that is to say, OBH. Thank you. Thank you. We'll see one of you. Who's elected? Mr. Archie. Good afternoon. My name is Troy Archie. I represent Mr. Hickson. I would just follow up Mr. Goldberger's argument that the murder was not intrinsic to the conspiracy. And to me, my client, Mr. Hickson, just factually, was a CEO of OBH. He was basically tarred and feathered in this case. No social media posts. He's not on social media, Facebook, Instagram, any of that. This murder comes in as intrinsic when the court could have just used the testimony of Stewart. But that gets in. Then the rap gets in with no limiting instruction, no First Amendment limiting instruction as to Hickson. So the jury's saying that Mr. West mentions his name in Miliano in the thing. He's telling his story. But still, there's no limiting instruction, no First Amendment limiting instruction. There's guns in this case. My client has nothing to do with guns, nothing to do with violence. And the social media posts are used over and over and over again in the case. Again, my client, the first time he even seen the social media is in Discover. So if he takes a picture with some of the guys, it goes up on Instagram. They make a quote. He doesn't even know about it. He can't look it because he doesn't check it out because he doesn't have access to it, Instagram or his phone, anything like that. So whatever a comment they put on there, which the government is used to say, look, these guys are good. They're a record company, but they're moving drugs. My guy has no say so on that, but it's used against him. Again, with no limiting instruction. Stewart's testimony, the murderer, the court, the government asked, does he know this guy right here, Jamil Hixson? I don't know him. I've seen him before. I've seen him in two separate places. So normally- Doesn't that help you in terms of this argument? Yeah, I think it does. It helps me that it should have been a severance. And I didn't represent him during the trial, but his trial counsel asked for a severance several times. It was denied. I know that's a hard hurdle in cases, but- What about the fact that he was acquitted? That hurts you. It seems to me, if you had a good argument, it would be a lot stronger had he been convicted of everything. But he was acquitted, which suggested the jury was able to compartmentalize the evidence. Well, I think that goes to the argument that's coming up on count one, the conspiracy, that the jury instructions were wrong, which the government and we also asked for, the defense asked for. So it's like a cocktail of disparity on my client. It comes to drug weight. We don't know what he did. He was never caught with any drugs other than some residue, allegedly when he was arrested, and some marijuana that he was not charged with. So I don't know what weight they found in a conspiracy because the jury instructions were not as they should have been, which I think that's going to be the next argument. But if you put it all together, I think this is like a prejudicial cocktail for Hickson himself, who was someone that was not in violence, not in the Instagram, not doing the other stuff, not involved with the murder. But again, he's tarred and feathered with this. There was no limiting instruction whatsoever of scanning through the record. There is none. Well, if he's part of the conspiracy, the fact that a particular evidence was admitted that he doesn't necessarily, he's not necessarily involved with, I mean, that's the nature of a conspiracy, isn't it? They wouldn't have to specifically say that this evidence is only relevant to X, if X is in a conspiracy with Y, because if it's an act in presence of the conspiracy during the course of the conspiracy, it's everyone's X. I would agree with that. But look at all the arguments about the conspiracy. The murder was intrinsic to the conspiracy, which we argued it was not. Then you got these rap videos that misinterpreted that the expert even said that. So that gets in. It's all used against him. The Instagram, which again, he has nothing to do with, doesn't even have it on his phone. All that stuff gets in. The only thing they really have on him is that he's going back and forth to California with some of these guys, and he takes a picture with them. The other client, Blanding, he puts a post and says we're making it snow in LA. I would invite the court to even review, you could Google rap lyrics, making it snow, Drake, Lil Wayne, Gucci Mane. It's gonna be different versions of what that means. The government is using it, but they're making it snow in California like they're dealing with drugs. But there's different interpretations of these things. It could have been a rap lyric. My client has no defense to that because he's not on Instagram. He doesn't know what it is, but they line up all these Instagram posts. He takes a picture with West. West is saying we're entrepreneurs, we're buying commercial real estate. Then he has the other one with Gadsden making it snow in LA. Other than that, they don't have anything with my client, but he's just with these guys out to lunch in LA. He used to live in Los Angeles, so he has an explanation for being out there. But other than that, it's just violence, the murder, violence, the guns, rap videos that talk about violence that he has nothing to do with, that doesn't do with the lyrics or putting it on YouTube. Do they have any text messages from his phone? Well, they definitely had text messages from his phone, but I don't think they were indicative of any drug activity. They have one they're talking about, and this is another point I raised in our brief, where they call him Mizzo. They say he's tied to this thing that say he was dealing with methamphetamine. There's nothing in the record that says that he's Mizzo. He was Miliano and OG, and then they get a text. They said it was Weston, another guy, I forget who it was, asking for a number that said Mizzo, and he put three numbers, 720. Not the full phone number. They just said, okay, that's Hickson, and it ties into a large quantity of methamphetamine that was not recovered. It's just a text between Weston, another guy, and talking about Mizzo. The government says it's Mizzo. There was nothing in the record. There's nothing in discovery that tied him to Mizzo other than the officer saying, we believe that this is him based on a conversation. They found multiple phones on my guy. None of them came up with Mizzo anywhere or whatever number they believe that they had. So again, he's stuck with all, he's just tarred and feathered with all this violence, murder, Instagram stuff that has nothing to do with him. So I believe a severance should have been granted because it was highly, I mean, this is one of the most prejudicial cases I've ever seen. So I understand you've joined the argument that evidence of Robert Johnson's murder shouldn't have come in at all as to any defendant, presumably, but if that argument were not to prevail and that was properly admitted, wouldn't it be admissible even at a separate trial? It would be admissible if Mr. Hickson had his own trial. Well, I don't think it comes in if it's a separate trial. I don't know how they get in on the 403. The facts of that was Wes was mad at somebody else and him and Stuart did that. Nobody else knew about that. I don't know how it's intrinsic to the proof that it was a conspiracy going on. That was something they did that no one even knew about. Yet, I don't know how it would get in under either 404B. I don't see how it would get in on a separate trial. The guns would not get in on this separate trial. It'd be hard to move that in. It would be purely a drug trial where they would have to try to prove the weight that he was involved in. But without this violence, I think it's just a normal drug case. Thank you. Thank you. Mr. Goldberg. Afternoon, Your Honor. If I can jump off my colleague's last argument. In regards to my client, we asked for a severance in that regard. Mr. Stuart referred to my client in derogatory, profane words questioning his manhood because he was not of the type to use violence. But in stronger language, which I don't think I need to do in this courtroom. And so what this case has as a result of the district court's rulings is one after another boulder being placed on the chest of our clients and trying to establish that, you know, the innocence or reasonable doubt. The next one I'm here to talk about deals with his erroneous instructions dealing with the conspiracy charge. The government had an opportunity to charge different counts alleging different ways that the conspiracy could have taken place. They chose to, in order to highlight that this is a high action, big weight drugs conspiracy, they decided to indict only on the specific types of drug quantities which call for enhanced penalties. They took that gamble. Anyone who's been a prosecutor would tell you that there's reasons for that. My client was involved with marijuana. They don't mention marijuana because strategically you don't want to give the jury an out. Maybe it's marijuana and he's back to the drugs. It triggered the higher mandatory members. I'm sorry? It triggered higher mandatories. Yes, higher mandatories, but they decided to go with that. I think it's reasonable to assume because they didn't want a compromised jury on any of the defendants to decide that there's no significant weights here and it's under a subsection of 841 which they don't charge. And so they, jury instruction by Judge Bailson was erroneous and I think the government concedes that in asking for convictions on those enhanced counts. And the defendants are sentenced on those enhanced counts. If you look at the JMC, they're offensive conviction is the two different types in excess of, for example, five grams or whatever. But he didn't apply mandatory minimum. No, he didn't. He didn't do that. But if his charge to the jury was erroneous as to the conspiracy charged in the indictment, then we believe what follows with that is that that conviction must be vacated. So back me up a minute. How specifically was he wrong charging the conspiracy? The government? No, Judge Bailson. Oh, in charging the jury? He charged the jury just dealing with the prongs that are charged in the indictment. How is that wrong? No, that's not wrong. But his instructions that followed were erroneous. And so the jury convicts believing it's rational to assume that our Judge Bailson's instructions, you can be convicted of the enhanced charged indictment if other defendants, it was reasonably foreseeable to them as opposed to, for example, my client. I made that argument to Judge Bailson. I said, the way you're charging this jury, this jury can convict my client of the enhanced penalties by finding that other defendants, it was reasonably foreseeable to them. Right. Which the government concedes is an erroneous instruction. And so if an erroneous instruction can lead to a conviction on those charged counts, those convictions should be vacated. In the JNC, you go to see what conspiracy is in the JNC, Judgment Commitment Order. What's in the JNC? It's the enhanced penalties. But you can't be convicted of the enhanced penalties the judge erroneously instructed the jury as to how you could find a defendant guilty of enhanced sentencings. And so what follows from that, I respectfully submit, is that the conspiracy count should be vacated and there should be no conspiracy conviction. And then what flows from that is my client's guidelines or determined, this gets away from the mandatory, my client's guidelines determined by Judge Bailson is 195 months. But the substantive count provides for 77 months. And so it is significant. If you can't be convicted based upon an erroneous jury instruction, then that count should be vacated and this sentence can't stand. But if you're right. I'm sorry? If you're right about your client should not have been convicted on conspiracy. There's a lot bigger problem than the weights of the judge. I mean, the whole thing falls. Well, I think the whole thing falls. I think we're entitled to a new jury. Okay, okay. I thought you were saying the conspiracy charge is no good. Therefore, a limited party. I should have gone for the bigger prize first and then talked about the smaller prize. But you're right. The whole thing goes away because you've got a jury. I mean, anyone's reviewing this case or even attorneys prepping for this. We're reading these statutes probably 30, 40, 50 times to parse all this out. The jury gets one shot at it. They listen to the judge and the instruction. They listen to Judge Baleson. And Judge Baleson rejects what the government told him that he needed to do. And said, you're courting reversal in front of the Third Circuit. And he acknowledged that it's up to this panel. But he acknowledged... The government said, if you apply the mandatory minimum at sentencing, then you're looking at reversal for new sentencing hearings. I don't think... But so what did the instruction get wrong or what did the jury get wrong with regard to the amount of drugs attributable to the conspiracy as a whole? The Judge Baleson tells the jury that, for example, with my client, you can find Gadsden guilty of the large weight conspiracy if you find that it was reasonably foreseeable to the defendants. It's not an individualized determination. So he doesn't parse it out. The government says to him, to me, this wasn't just an Alene argument or a Williams argument or whatever. It was bigger than that. It's whether or not the conviction for conspiracy can stand because of Judge Baleson confusing the jury or improperly instructing the jury as far as what's necessary in order to be found guilty of what the government decided to charge them with. Did Judge Baleson try to fix that, so to speak, at sentencing by emphasizing that he wasn't imposing any sentences to other demanders? Well, that's why I got involved with Judge McKees. That's why I'm saying he still made the mistake because what should have happened at that point in time, I asked that he, I said the sentence on the substantive count is he gave him the high guidelines, concurrent 195 months. And the guidelines, just by way of example, the guidelines for my client's substantive count is 77 months. And so my client's getting charged as if the instructions were proper, as if it was proven to the jury. And I think it comes down to this court has stated a new trial may be granted due to an erroneous jury instruction if the instruction was capable of confusing and thereby misleading the jury. And I think that's what happened in this case. That's very confusing, telling a jury that you can find Gadsden guilty of the large weight conspiracy if the defendants, it was foreseeable to them. And I would ask the court, I know I only have three minutes here. I'd ask you to take a hard look at his hamstring, the cross-examination of Gadsden by myself. Of the agent. Yeah, the agent. I would submit to this court, it scares me, but in almost a half century of practicing criminal law, it's the most restrictive I've ever seen. And when you see that and they're left as far as Gadsden's concerned, this was the case against Gadsden. And he restricted, he demeaned, he interfered, he gave a five minute time limit and then told me to sit down. And I think we have trial attorneys on this panel. The rule of thumb is, if in direct examination by the government, they're making a point in 10 minutes, to dismantle a cross-examination, you need more time. It's peeling the onion. Judge Baleson's analysis in this case is, well, your colleagues, they already cross-examined for eight minutes or nine minutes or 10 minutes. I'm not restricted by doing that. I know what I have to do in this case. And I shouldn't be restricted by respectfully a trial court. And I would submit that occasionally, I know what the standard is. And a lot of times the cases that come from appellate courts is very deferential. It's the judge's decision to how he's going to manage cross-examination. But every now and then, it's a good idea to define the boundaries. When attorneys get off the reservation, it's time to, you know, rope in defense counsel. When trial courts are getting the go-ahead that is all discretionary, and we can continue with this, it's time to draw that line again and put the roadblock signs up. And I'd submit to you, this is a case that warrants it. Thank you. Thank you. Good afternoon. Good afternoon, Your Honor. You want to start with the phones in the car? Very well. Your Honor's protectual stops are lawful, but they're not a free pass. They're still circumscribed by the probable cause on which the officer is relying to authorize the search of the car and the seizure, if applicable, of evidence. And the government takes, essentially, two tacks here. One, although they don't really come right out and say it, they kind of suggest that mere possession, that probable cause of a mere possession of narcotic substances would permit seizure of a cell phone. That is simply not true. And it cannot comport with fundamental principles that distinguish reasonable suspicion from probable cause. And it really wouldn't even be reasonable suspicion. In terms of probable cause of trafficking, then, which is really what I think the district court assumed in order to justify the seizure of the phone, the question then becomes, which, if any, of the factors known to Officer Vargas on the scene would give him probable cause to suspect Mr. Blanding of trafficking? Now, of course, ultimately, Mr. Blanding was charged only with possession. The affidavit to the search warrant, did that suggest a belief of trafficking or just in possession? The affidavit to the search warrant, Your Honor, absolutely suggested and I think was found to have established by the magistrate, probable cause of trafficking. But that was months later. We're back at the car stop where the Philadelphia police officer, having been told only that he should wait around for a traffic violation and an opportunity to conduct a protectual stop, did as he was told and then did his best. He later testified at trial that he got some sort of promotion because he was good at this kind of thing. He did what he does well, which is just kind of keep pushing until he thinks that he's created an opportunity to grab those phones. But he hadn't, Your Honor, because the factors that ultimately the government and the district court relied on did not separate innocent conduct from guilty conduct and they certainly didn't separate probable cause of possession from probable cause of trafficking. What about an inventory search, right? So the car stopped. It was a rental car, right? It's a rental car. So apparently he had a license issue. So he stopped. The police are going to do an inventory search of what they find there, right? So wouldn't they have found these phones and held onto these phones under any circumstances? No, Your Honor. And there are actually several layers to the question of inventory search. The government kind of gestures toward it a little bit and it's brief. And here's why. Inventory search would be an independent source analysis and they never pursued that below. The word independent is not in their brief on appeal either. They have waived that. But what inventory? The reference to the inventory, Your Honor, first of all, I'll just review exactly what it is that they point to. But it's important to remember what this court requires doctrinally when the government tries to make an independent source argument. And what they would have had to do would be to show that... I'm sorry, I'm getting mixed up on independent source and their... Sorry, Your Honor. I was just mixed up on those two on the inventory point. What they never did with the inventory point is to show... In fact, this is inevitable discovery. I apologize. That's why I was mixed up. The inevitable discovery is really the argument that they never made. And that's the one that turns to inventory. Now, when you look at the record, Your Honor, what you see is, in fact, Officer Vargas testifies, and this is at 3 Appendix 1237, that the phones never got into inventory at all. They were turned over almost immediately to the FBI agent. Second, of course, there are property receipts. And what the government puts into evidence is the property receipts. But as Officer Vargas also testifies, they're just keeping track of the valuable things that they're taking out of this car before the car goes to wherever it would have. Now, if they're going to try to make the inevitable discovery argument, and they really did waive this because they would have had to prove it, what they'd have to show is, first, that the inventory search, of course, would not simply have been a listing of what was found in the car, but would have meant retaining the items that were found in the car. And, as the court knows... So it would be different if Philly police had held on to it versus the FBI? No, Your Honor, it really isn't. I think that the government kind of hits that point because they're trying to say, well, maybe there was a rogue Philly cop out there who grabbed these phones improperly. But that's, frankly, not credible. This police officer was not on patrol and pulling over blending. He was responding to the FBI's instructions. In fact, the FBI agent, Stevens, cross-designated, is also on the Philly PPD paperwork. And here's the crucial point... Well, before you answer that question, because of the inventory search, wouldn't it have to be an inventory search done by the Philadelphia Police Department, and not two months later by the federal authorities? Yes, Your Honor, but two points on that. First, I should say that I'm answering that question, Your Honor, just from kind of common sense, general knowledge, how these things work. None of this is in the record. And as the court knows, the whole point to inevitable discovery is that the government has to prove that these matters are not within the discretion of the individual officer. That, in fact, these things would have happened inevitably had the illegality not occurred. There's no evidence of that whatsoever. Second, inventory search is not the same as what you keep. And Officer Vargas' testimony, again, it's the portion that I cited, that's 3 Appendix 1237, but also at the suppression hearing where he's talking about the property receipts, he's saying, we're keeping track of these things. But what happens, and he refers to this in his trial testimony, is they're keeping track so that the defendant can come back and get the stuff later. There is nothing in the record suggesting that when someone is charged with mere possession, the police can hold their phones for a later search. That would be an astonishing rule if somebody's walking down the sidewalk smoking a joint and the officer recognizes the smell and they're taken into custody for mere possession.  Of course, that's not the rule. And this goes back to the government's attempt to turn this mere possession offense into a justification for seizing the phones. There's no reason to seize phones when the charge is possession rather than trafficking. And that's also why the inventory point simply doesn't make a difference because Mr. Blanding was able to go back and get his soundbar and his boots and the other items that were inventoried and returned to him because they weren't evident. How long after the seizure was that returned? That's actually not in the record, Your Honor, but I will tell the court extra record and see if that's what you will. Very promptly. He was in custody for a matter of hours and I'm not sure when he actually went back, but very, very promptly. And typically, the phones would be in that box too because this is a person charged with mere possession, not a person who is charged with trafficking. So in fact, Officer Vargas does turn the phones over immediately to Stevens, who's with the FBI. And the FBI sits on them for three months. Now, again, the question of whether PPD held them at FBI's instruction or the FBI held them itself is not important, except insofar as the government comes up with this idea that they can just dump everything on Officer Vargas and say that that doesn't affect the legality of the FBI's later actions. And of course, I should clarify there too, the government spends so much time talking about the validity of the warrant. And the validity of the warrant and the idea that the warrant basically gives them independent source, gives them attenuation, and gives them good faith. But the warrant wouldn't have happened if they didn't have the phone. There would have been nothing to search. And so there is absolutely no way to say that the warrant, which the validity of which we do not challenge, the warrant is independent of the phones, of the illegal seizure of the phones, because there wouldn't be a search of the phones if they had not already been seized. And it's similar, Your Honors, with respect to the protective suite. Because again, this is, the government urges the court to follow the non-presidential last opinion, which the court already disapproved in white. It's very, very clear. It's the law of this circuit and every circuit that if you are just outside the home, you're looking at the repronged two. And that really has to be the rule. Nothing was recovered. Those were two phones, right? Seized from the, when he was arrested and went inside the department for a quote suite. But nothing that was admitted was seized from those two phones, was it? I believe that's correct. Although this is a wildly complicated record, and Your Honors question gets to the point as well as to why I suggest that the court remand for a hearing on the scope of suppression. So let's take the government at its word that nothing from those phones was admitted. It's very difficult to cross-reference. But of course, they make the same point with respect to the mail taken out of Landing's car, that the mail itself was not admitted. But they relied on it. The mail is in the subsequent warrant. And the real question on remand, on scope of suppression, would be, if they were not supposed to have these phones, all four really, because if they were not supposed to have the phones and they were not supposed to have the mail, then the scope of suppression will include the derivative use of them as well. Of course, evidence is what gets suppressed. But if they relied on the mail, if they relied on the contents of the phones in order to, and incorporated that into subsequent warrants, which they did. There are subsequent warrants referencing, in fact, the recipient of the mail, who's well-known to the government as well as to Mr. Blanding, a relative of his. And all of that was material that the government relied on and, in fact, brought a charge on the basis of. So the mail was seized as part of the protective sweep when they went in to get the two phones. The mail was seized from the car, actually. The car, OK. Yeah, yeah. But it's the same analysis, though, Your Honor, because whether it's they exceeded the bounds of the protective sweep, which they clearly did. The government has this sort of safe distance test that would really make this court an outlier and really would overturn the court's decision in white. But because all of those phones should not have been seized, the subsequent warrant doesn't cure that because, again, there'd be nothing to search if they hadn't seized them improperly. So everything that the government does to try to purge taint ultimately comes right back to the phones themselves. And then they suggest to this court that the question is, was it evidence or wasn't it? But the scope of suppression has to include derivative use. And there's fact finding to be done as to how the government used these materials investigatively, even if, ultimately, at the end of the day, they did not end up offering them at trial. So I think I understand you. So although we're not clear what, if anything, you seek to suppress from the second set of phones, you think you're entitled to a hearing to determine whether or not they used any of that information to follow up on what? That applies to both, Your Honor. And I should add, of course, the government also, even if they didn't introduce individual messages, they had charts upon charts with all kinds of cross-references showing what was seized from whom and when, and just using even the contacts in various phones to make the connections among the alleged co-conspirators. Again, I don't want to mislead the court. I don't know the answer to whether those precisely came from phones 29 and 30. I know they came from 1 and 2. They also put phones into physical evidence, which, as the court knows, has quite an impression on the jury. Here's the silver iPhone. Here's the gold iPhone, et cetera, et cetera. So there's that question. But for all of the improperly seized evidence, there's also the question of how was it used derivatively? Because that's just the downstream fruits analysis. The fruits analysis is not only the thing itself that was seized, but anything that flows from it. Well, that had been covered at the initial suppression hearing. Isn't that within the scope of a suppression motion? The court said that suppression, the court said that these were valid seizures, Your Honor. So at the end of the day, there was no fruits analysis because the court said both that there was probable cause of trafficking just from, I don't know what the spell is, marijuana, and that, in fact, the protective sleep extended back inside the apartment. Your Honors have the video. If there's any question, the government has this amazing tale of Mr. Blanding being dragged out of the apartment and trying desperately to close the door behind him. If Your Honors have not already, please do review the video, because what you'll see is somebody who very calmly steps outside. And in fact, Judge Belson made findings of facts that said exactly that. What if the government's argument that the agents on the scene were encountered in this protective sleep given the dangerous nature, so to speak, of this conspiracy and they didn't know who else may or may not have been in the apartment? This is a reasonable suspicion analysis. And this quote's very clear about the fact that bouifront 2 is a reasonable suspicion standard that is equivalent to could there be a carry stop? May or may not doesn't work. Could be, have a hunch, there's a possibility. And not only is a mere possibility that others are present insufficient, the mere possibility, let's talk about Janina Miller, Mr. Blanding's then fiance, whose apartment it was, there's testimony in the record about the June 2018 search of her apartment. There's a photograph that went into evidence, it's Exhibit C, at the second suppression hearing, of Ms. Miller and Mr. Blanding sitting calmly in the dining room while the agents execute a search of the apartment. So it's not just, might Ms. Miller have been there? In fact, she'd left for work about a half hour or so earlier. It would be quite surprising if given the extensive surveillance, the agents didn't do that. But regardless, the possibility that she's there is insufficient. The certainty that she's there would also be insufficient unless there's an articulable and objective basis for saying Janina Miller is going to be dangerous. That, in fact, she is a threat. And unless the government were able to say both of those things, the protective suite lacked reasonable suspicion and it was improper. That means then remand for the scope analysis on those as well. Is your remand suggestion that we hold our decision about whether there was any prejudice from an unlawful admission of the failure to suppress this evidence until the district court tells us what the fruits were because we don't have enough of a record? I mean, normally, if we said those should have been suppressed and we say, well, you know, it either was harmful or it wasn't. And if it was, we'd say you get a new trial. So I'm not sure how to fit this remand into that. I understand, Your Honor. And that is the typical situation. If it's a gun, then it's very clear. So clearly the phones, of course, have to be suppressed because they were seized illegally. Now, the question of what the physical phones, at least two of them, maybe all four of them, came into evidence, what content of those phones came into evidence also then would be suppressed. But this isn't an undertaking for this court to comb through the record and figure out exactly what came from where. And then there is this derivative question of how were these things used for subsequent investigation? Now, at the end of the day, I believe that this court's opinion should say illegally seized, suppression is required. We revamped the district court to determine the scope of suppression given factual questions that were unresolved in the record. What if it's judgment of conviction and sentence? What happens? What do we say about that? I think the judgment of conviction and sentence has to be reversed, yeah. So I don't know if I'll ask counsel for the government, but it seems that the, any unknowns about what came out of the phones really pertain to the phones in the apartment. Like it seems like we know quite a bit of what came out of the phones seized from the car. Do you agree with that? We don't know as much about the derivative use. We don't, I'd say that we are equivalently in the dark on the derivative use of both. And there's also the derivative use of the mail. Because again, the addressee, the name is redacted from the warrant, but actually became the basis for a separate count against Mr. Blanding. It was dropped eventually during trial, but it was another person that the government very much connected to their prosecution theory, even independent of that individual. So there is that inquiry as well. In this record, we only have redacted versions of all three warrants. Did Mr. Blanding get unredacted versions at any point? I don't have unredacted versions and I have everything that trial counsel did. Mr. Goldman might be better able to answer since he was, he was the only one there at trial. But I believe that Mr. Blanding was able to discern and it is clear from context to whom the mail was addressed. But I don't think that he ever saw an unredacted version. Okay. If I may, I'm the... I'm sorry, go ahead. If I turn to the continuance issue. The sentencing issue. Yes, the continuance of sentencing issue. There are some issues as well in the court noted interest in the waiver versus forfeiture question on the 851 enhancement. But I'd like to turn to the continuance first. The court's raised some technical questions and as your honors know, Judge Restrepo having written, Chapman and Judge McKee being on the panel, there's a complicated overlay and kind of intersection of rule 32, due process, the right to counsel, the right to allocution, which is ancient and honored, but non-constitutional. All of these things I'd love to talk about. That's okay. They're super juicy and interesting, right? If you don't want to miss your bubble, I do feel obligated. Yes, I appreciate that, your honor, because here's the heart of it. And it's really the heart of it because of what the Supreme Court has said about why allocution is important. Mr. Blanding, not even 40 years old yet, facing 360 to life guidelines for no fault of his own, confronting a sentencing court with no ability to prepare, says to the court, I feel given what I'm facing, I should be afforded the opportunity to meticulously review the PSR and to confer with my counsel to prepare to meet it and present other information. This is off the cuff from him, but he's getting to the heart of it. And then he says to the judge, I really wanted a chance to show the court a little bit about who I am as an individual. He asked for two weeks, two weeks, in which to be ready to do all of that. He had materials with him already that his counsel didn't know about yet. And the court said no. The court said no, having just extended by 11 weeks, apparently for its own calendar to take care of post-trial motions, the sentencing date. The court said no, even though it didn't wrap up sentencing the trial defendants for another four months. And the court said no, literally for no reason other than it's COVID, we're backed up, let's go. And this is a judge who, before he had heard a word of mitigation, before he'd heard a word of anything about who Mr. Blanding is as an individual, said to defense counsel on that Monday afternoon conference before the Wednesday morning sentencing, he's as ready as he'll ever be. It's eerily reminiscent of the phrase in Chapman. I feel it, I think I need to know. And that's Judge Chapman, as your honors know, was a judge who had already gotten a really substantial allocution letter from the defendant, already had gotten a lot of material. This judge had gotten zero, but was ready to say, he's as ready as he'll ever be. Told defense counsel, oh, go ahead and get your sentencing memo to me Wednesday morning. The hearing was at 10. So the judge had decided, and I do not mean to minimize the pressures on the trial courts and on this court during COVID. It's now seeming a little bit remote to us. But of course, the incarcerated population were some of the most vulnerable individuals. And Mr. Blanding had not seen his lawyer in more than a year. And the government says, oh, it's plain error because he didn't say allocution. The government says he was playing games because he's talking about post-trial motions. Now he's talking about post-trial motions, because he was already way older, because he hadn't talked to his lawyer in a year. As far as he knew, he was still going to have an opportunity, as he correctly opined he should, to consult with counsel and to have that due process in the sentencing context in particular. But more generally as well, it really proves just how at sea and isolated he was at that time. So the government still to this day articulates no reason at all that April 7th versus April 21st was so important. And we could get into the nitty gritty of the constitutional rule versus the Rule 32 questions. But as your honors know, even on plain error, the denial of the right to allocation, interference with that, is sufficient to warrant resentencing if there was any opportunity for this to have made a difference. And in fact, Judge Baleson kind of acknowledged this, right? Because what he said was, I really would like to hear more about your record. And Mr. Blanding's sitting there flipping through the PSR that he hasn't seen in months, kind of trying to figure it out, figure out what to say in real time. But he sentenced well above any applicable mandatory minimum. So there's clearly the opportunity for this to have made a difference. And in fact, the court's own comments really support the inference that it would have. And- We assume that anyway, right? After Chapman, we presume prejudice. Exactly, exactly. And there's absolutely nothing that, there's really no way to refute it. And the other aspect of this that's really crucially important is, this is the first case, to my knowledge, in which the court will confront a judge who has actual knowledge that the defendant has not consulted the counsel about the PSR and preserved that objection. So the mark he cited in the papers, that's a defendant who didn't raise the issue, although he said to the judge, I haven't reviewed the PSR with counsel, and the judge said, oh, well. But this would be the first preserved error. And I submit to the court that it is very important to clarify for trial judges that Rule 32 has substance, and the verification requirement isn't just check a box. When the rule says, verify that, in fact, the defendant has consulted with counsel, that's because of due process. And it's because of the right to counsel. And that's where we get that constitutional overlay that unquestionably requires a resentencing here. As your honors know, I submit that out of resentencing as well, Mr. Blanding's sentencing range for the 841 count should not, in fact, be enhanced by his prior Pennsylvania conviction. Mr. West joins this as well. This issue is not waived. And in fact, the court has been absolutely explicit, and so has the Supreme Court in Alano, that you can't waive an issue you don't know exists. And when the court looks at the record, you will see that defense counsel, having gone through with the district court, their assent to the factual questions that would be put to the jury, they do not, they sign the stipulation, no question, but they do not manifest some sort of an understanding of what, in fact, the statutory issue was going to be. And certainly, there was no strategic value to waiving it if they had understood it. When the court finds waiver, what the court finds is somebody requested a stark hearing and then changed their mind and used the evidence instead. Or the trial judge raises an issue and says, hey, I think that this is error, and defense counsel has some reason for going along with it. So none of those things happened here. And it is really required by Alano and other presidents of this court and the Supreme Court to look at the question of what they, whether it was, in fact, a knowing waiver for strategic purposes. And the government says that it was waived, but the government says that this court can't look at the record. But case after case says, this is context-dependent, and the court must look at the entire record in order to figure out whether this was, in fact, a knowing and intentional waiver, which it clearly was not here. Now, I submit that your honors can rule on the existing records on this issue. The government wants to put on a chemist to talk about interpreting a statute, which is sort of an interesting idea. But what we have is a facial mismatch, which this court has recognized in the Martinez case. The government says that that was sort of cursory. That was the Judge Beavis' opinion. He's not known for being flipped with his words. And I think for the same reason that it was important in the immigration context, the court can look at the facial overbreadth, the mismatch between the federal and the state statutes. Now, if the Supreme Court reverses Brown, depending on how the Supreme Court reverses Brown, if it does, and I'm not going to go on record hazarding a guess about anything the Supreme Court will do, then the 851 issue possibly goes away, depending on how Brown gets reversed because of the way that the timing of the state conduct and the federal conduct works out with the federal descheduling. So should we hold that CAV? I think it would make sense, your honor. Why not? We may hear from them Thursday. We're here in the middle of May, right? And then it's general opinions, right? I mean, it was argued a while ago. It was argued in November, I think. Frankly, I thought we'd have the ruling by now, but we don't. Yeah, it's one of the issues, I think, that they're trying to deal with. In Brown and Jackson. Well, I'm sure that there are some important things up there now, your honor. But I think at this point, we're fairly close to the end of the term. And there's no reason for the court to weigh in. If Brown gets affirmed, or again, if it's reversed in some way that doesn't affect the need to compare the federal schedule with the state schedule. Again, I do submit that this is a question about statutory interpretation. We don't need chemistry degrees to address it. Thank you. Thank you, and good afternoon, your honors. Good afternoon. I will be responding to the arguments that Ms. Mathewson just presented to the court. And at Judge Eschepro's urging, I'd like to start with the phones in the car. So Ms. Mathewson would have this court believe, on behalf of Jamal Blanding, that law enforcement engaged in deliberate misconduct when seizing four phones in two different situations. And that could not be further from the truth. Does it matter whether it's intentional misconduct or just an inadvertent violation? Yes, it does. It does matter whether, under the Herring case, your honor, it does matter whether it was intentional misconduct. And I would encourage you to read Herring in depth because it really does lay out. You're right, I forgot Herring. I read it a while ago. What the court was interested in there was making sure, looking to the purpose of the exclusionary rule is to deter police misconduct. And so the intent of it matters greatly. If we have a situation where, if we were to conclude that either scenario, the car stop or the detective's feet, if we were to conclude that the police exceeded the parameters of the Fourth Amendment, why wouldn't a ruling suppressing the evidence basically not be inconsistent with Herring and that we would be deterring future offenses where police would know, under Bowie, if you have a situation where someone steps out into the hallway, we would be reinforcing the fact that in order to go inside and do the so-called protective sweep, you have to have reasonable suspicion. In the car stop scenario, if you're going to seize phones, well, maybe you can help me explain why that seizure of the phones was okay with the car. But if you are going to seize phones pursuant to inventory stop or the traffic stop, whatever, you can't then turn it over to another authority. They hold it for three months and then you get a warrant to see what's in the phone. Yeah, that's simply not what happened here, though. And I think your question sort of assumes some facts that have been presented by... Well, my question is based on what's in my very well-written bench memo, actually. I don't doubt that, Your Honor. A smart judge hires smart clerks. But in this case, they're really... Ms. Matthews has just previously pointed you to one single line in the trial testimony of Officer Vargas, in which, during some testimony where the government was trying really to establish nothing more than chain of custody for those phones, he mentioned something about the phones from the car stop, Your Honor. The October 25th, 2017 car stop. He says, oh yeah, I gave them to Task Force Officer Stevens right then. But that's really undercut by other aspects of the record. In particular, there's a property receipt here, which is at 3507. And as my friend Mr. Goldman pointed out, there's trial lawyers on this panel. And so a trial lawyer knows that those phones stay with that property receipt. That's the purpose of the property receipt. The property receipt, those phones are seized by Officer Blanding as evidence in his state law case against Blanding. They then sat in PPD evidence until the FBI developed the probable cause, which they included in the warrant, and then went and had that warrant sworn out to search those phones. The record- Really police until the warrant was sworn out? It does, Your Honor. And in fact, there's a record, I'll point to you to page 336 in the record. There's a discussion in which my colleague, Mr. Witherell points out to the court that we have supplied Mr. Blanding's counsel with documentation that shows that the police went to, or excuse me, the FBI went to pick up those phones on January 31st of 2018, and Mr. Hughes, Blanding's trial attorney, says that's correct, Your Honor. He affirms that. And so though the documentation, I take Ms. Matheson's point in her brief that the documentation is not specifically defined, that in that record, his own trial counsel said, yes, Your Honor, that is correct. Those phones persuaded to that property receipt were in PPD evidence for three months. They went and got them on January 31st, 2018. They swore out the warrant on February 2nd of 2018. And that warrant relied not at all on what has been described here as an unlawful seizure of those phones. But for a number of reasons- Well, let's pause there. I mean, regardless of whose custody the phones were in from October through January, why did Officer Vargas need to seize cell phones based on suspicion of simple possession of personal use quantities of drugs? I don't think that's quite true. I mean, he's probable cause to seize those phones, both as evidence for his simple possession case. For example, there's an unmarked liquid in a baby bottle, and there could be information on those phones which shows perhaps communications with someone from whom he purchased that. It would show sort of that he knew what that substance was. Is that what we're gonna be allowed every time that an officer stops someone with a personal use amount of drugs, they can take their phones and seize them and then get a warrant to search them? And that seems really probable. This is Ms. Dattleson's point about someone walking down the street, smoking a joint, you just go and grab their phone. You know, that's not what I'm saying. What I'm saying is he did seize those phones of evidence for the simple possession. But he also had probable cause to seize those phones to have evidence of drug trafficking. And it is not true that you can only seize potential evidence related to the purpose of the arrest. So what he knows is he knows that the FBI, that he's helping the FBI with a drug investigation. He knows that he pulls Jamal Blanding over. Jamal Blanding has $7,000 cash in his pockets. He's got some drugs in the car. There's a dog sniff that hits off two places in the car, yet they don't find bulk quantities of narcotics. I thought your previous arguments were based on Officer Vargas not even knowing the subject of the investigation on the federal level. So going back and looking at the brief, sometimes you wish you could say it a little better. And I think there's no, the point there is there were no specific facts conveyed to him. And we didn't want to mislead the court in any way that the FBI had told him, hey, look, we think this person is doing this. It's in the record. Officer Vargas says, they told me it was a drug trafficking investigation. That's something that's available to him and known by him at the time. Whether he knows the facts that lead to that conclusion or not, that's a fact that he has. So he was gathering evidence for the drug trafficking investigation. He was not. In fact, the property receipt. Yeah, they're both ways, isn't it? I'm sorry? Yeah, they're both ways. I think we can, Your Honor. He says he sees. He has your cake and eat it too. I like the way the cake looks. I like the way it tastes, Your Honor. But I have the property receipt, which I referred to at 3507, refers to these felons as being seized as evidence in his state law case. But at the time where he is, there were certainly probable cause to seize those felons at the time that he did. Probable cause that those felons would contain evidence of drug trafficking when he seized them. Let me read you something from the U.S. Supreme Court. So long, and this deals with the delaying, I'll show you through the case, delayed acquisition of a warrant. So long as a later lawful seizure is generally independent of an earlier tainted one, and then, which may well be difficult to establish where the seized goods are kept in the police's possession, there's no reason why the independent source doctrine should not apply. Supreme Court seems to be saying, if you have a situation like this, where the seized goods are kept in the police's possession, you may well be into the situation where you have an independent source doctrine. I assume that's what you're arguing. It absolutely is, Your Honor. And I think there was a little bit of confusion earlier about, you were asking about an inventory search. And in fact, there is testimony in this case that the police did conduct an inventory when they took that car back. And of course they did, because it was a rental car and they called the rental car company and the rental car company came to take it. So they had to take all of the items that were in that car at the time and they were to inventory them. So the independent source doctrine and the inevitable discovery doctrine are closely related. I mean, this court has certainly said that. And in this case, I think when you don't press the inventory search for an inevitable discovery bent, or at least the way it's described, it's because at that point, the phones weren't discovered. There was no sort of new, there's nothing new to be discovered. He was certainly lawfully pulled landing over, certainly lawfully searched the car. No one's questioning that. And in the process of that, he found the phones. I think that's what Judge Freeman's asking about. And I think he said there was evidence to support his suspicion of drug trafficking. Was that the cash, the liquid, and cell phones? Is that what you're referring to? His demeanor, the fact that he was nervous speaking to Officer Martin. That is one of the weakest arguments in the history of mankind. Well. You say that when someone's pulled over by a police officer. In fact, when I was teaching at Townsend Police School, I used to hear, he was nervous when I pulled him over. Therefore, I suspected something. Another cop would say, he wasn't nervous when I pulled him over. Therefore, I suspected something. But that's not all we have here, Your Honor. OK, we also have the $7,000 cash in his pocket. We have the multiple cell phones. OK, but please don't use that as an argument. Because that argument, I find absolutely, it's beneath the dignity of a person of your intellect. It's suspicious, because someone got nervous when a police called him over. Who warned you? Well, Your Honor, perhaps I should turn to the fact that the exclusionary rule should not apply, regardless of whether you find initial unlawful. I want to unpack a little bit the relationship between the Philadelphia Police Department and the federal law enforcement agents in this case. Because it seems to get really messy when we're talking about Officer Vargas. We refer to him throughout as police officer, Vargas, which he was. But he also says a number of times in his testimony that he was detailed to the Department of Homeland Security. So was he also a federal officer at the time of the stop in October 2017? Your Honor, I know that there's reference to that as I stand here before you. I don't know if that was at the time, or if it was preceded it or came after. On the day of the stop, he was not working in any close coordination with the FBI. A task force officer from the FBI called, said, could you help us with a car stop should we need it? He then heard over police radio that the car was moving. He conducted that traffic stop. So no, I do not think that you can say that he was a federal law enforcement officer for purposes of that investigation. So the call was from FBI Task Force Officer Stevens, right? And then Vargas says that he gives Stevens some of the fruits of his search right away, right? And I understand that's contradicted by the property receipt. But nonetheless, it seems that Stevens asked for the stop. He asked for the search. He spoke with Vargas immediately after. And Stevens was somehow involved from the day of the search in October 2017. So four months before they got the warrant to search the bus. Well, he was certainly, as a FBI Task Force officer, he was involved prior to the stop. And he was involved after the stop, to be honest. But he did not, aside from that one line from the trial record, he did not seize those felons on that day. Those felons went to Philadelphia Police Department evidence. But let me, if I could turn to these. But again, they were in support of the drug trafficking suspicion that the FBI had. His testimony is that he seized them as evidence of the simple possession case. And they were entered onto a property receipt as evidence of the simple possession case. I'm simply saying that he also had, at that time, probable cause that those felons would have evidence of drug trafficking. But to Judge McKee's point, perhaps I should move on because it's not, at least Judge McKee seemed to doubt that argument. So if I could move to the exclusionary rule. Two greater than one. Judge Freeman, I'm happy to continue to discuss this. I'm cognizant of the time. And I'd like to move on to the exclusionary rule if that's OK. So this is certainly not deliberate misconduct on the point of Officer Vargas. Whether he had the probable cause to seize those felons or not, I mean, he did. And he entered them as evidence. This is not the kind of thing, you know, the question in the hearing turns on the culpability of the police and the potential to deter wrongful police misconduct. And that's just not what we have here. You know, and when the factual argument, as we've, falls, the idea that he was somehow in cahoots with the police, with the FBI, to specifically go and grab those felons, the record just simply doesn't support that. When that fails, the hearing analysis actually becomes very strong. Attenuation is also the fact that there was a three-month break in between when the felons. You think that counts in your favor? It does count in our favor. The three-month break between the seizure of the felons and the execution of the warrant certainly counts in our favor under the attenuation. Was the Supreme Court just having a bad day when they had that language in the Murray opinion? Which language is that, Your Honor? So long as a later lawful seizure is generally independent of an earlier tainted one, which may well be difficult to establish whether the seized goods are kept in the police's possession. There's no reason why the independent source of possession should not apply. It's from, I can't tell what page it's on, 533. That's that site's quote. It must be 537. And your question is, was the Supreme Court having a bad day? Well, yeah, because you said that three months should not mean anything. The delay between getting a warrant, and I'm suggesting to the Supreme Court, I think they're saying that that big of a delay may well be problematic. And so that's where I thought maybe they had a bad day. Yeah, I simply don't. The FBI did not, had the purpose here been to just go and grab those felons, they would have just grabbed those felons and they would have signed for that warrant as soon as they could. They didn't. They kept investigating. Really, what happened, you have to think about the context of the stop in the investigation. It's relatively early in the investigation. If you look at the warrant, much of the evidence they developed about Blanding sort of followed that. And so they started to follow these gentlemen as they went to California to purchase drugs, and they used that information to get the warrant. But isn't that the problem? Because they didn't have enough to search the phones in October 2017 when they were seized. And so they then developed probable cause. They developed all of that through that very extensive investigation that they did over the month. And then in January, they're like, okay, well, now we have information. And look, there happened to be phones that we asked Officer Vargas to stop someone and maybe find for us that have been in storage for a few months. There's nothing in evidence to suggest that they told him to go get those phones. In fact, in the trial record, Your Honor, when West's lawyer is cross-examining Vargas, he says, all you cared about the phones, right? And he said, no, I didn't care anything about the phones. They did not direct him to go get those phones. They directed him to conduct a pretext to stop. Sure, yeah, I hear you there. But unless we're gonna say that if it's reasonable for police to seize phones for simple possession, then it seems that those phones were related to the drug trafficking investigation. But I guess, is that the deliberate misconduct that's considered by Haring? Is where I've come back to? Haring is being, Haring says, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some instances, recurring or systemic negligence. So, I mean, it doesn't have to be deliberate. That's one of a few options. Sure, sure, but even just the sort of one-off event here where Officer Vargas may arguably have seized some phones that he should not have, doesn't come, doesn't rise to the level of what Haring is talking about. I think that's our point, Your Honor. Now, I also wanna note, and there was a lot of talk about the evidence that comes off these particular phones. And to be clear, and also the phones from the protective suite, which I'm gonna talk about in a minute. To be clear, these phones, there was some evidence taken off of these phones. But again, this was relatively early in the investigation. So, no text messages, no nothing that was taken from these phones on October 25th of 2017 would impact, say, the communications that led to the search and seizure of all of the drugs at the One Water Street apartment nearly a year later, in which the drugs in that particular apartment, just based on count 12 alone, nothing changes in this case. I mean, that's the lion's share of the drugs in this case came from the seizure. I saw a very clear harmless error argument in your brief about the phones in the apartment. Yes. But I didn't see one about the phones from the car. And it seems that, even setting aside derivative use, there was just a whole lot of inculpatory evidence that was put into trial from the phones in the car. There was certainly more. But those phones did not impact the ultimate search of One Water Street apartment and the seizure of the drugs from those. That was well downstream from those phones. And so that's my only point is that, again, the information, to the extent there were text messages related to count six, which preceded the seizure of these phones, there could be information on this phone related to count six, but not necessarily count 12 is my only point. If I could turn to the protective sweep of the apartment. And here, I'm just gonna start off with where we ended, and that's with harmless error. Because there really is no need to remand this for some sort of recent hearing to determine the prejudice involved. There were two phones seized from that apartment. The entire digital extracts from those phones were submitted into evidence, but not shown to the jury. They were simply there to say, if should we need to pull something out, we'll pull individual pages out as specific exhibits that will show the jury. From those two phones, one single page, it's 711C, exhibit 711C, is the only thing that went into evidence from those two phones. What's that 711C? 711C is a reference to, with a particular phone number and the name Mizzo, which I'm sure my friend, Mr. Archie, will take some interest in. But it was really only one page from those two phones. So the error there is to the extent there is any, and I'm gonna get into why there isn't, but it was certainly harmless. So here again, there's no deliberate misconduct, but the question before you is whether prong one or prong two of Bowie should apply. And really under either one, the government should prevail. Prong one should apply though, because it's the only path that's consistent with all of this court's decisions, including Judge Becker's decision in Latz. And although Ms. Mathieson described white as sort of negatively, is treating Latz negatively, the truth is that white really did nothing of the sort. It distinguished Latz and says- Latz is an NPO, isn't it? I'm sorry, yes. Latz is non-presidential? Yes. Absolutely, Your Honor. But- Mr. White has been arguing for years in vain that if we stop putting all the facts in our NPOs, this would not happen. You wouldn't be able to say them back to us. And you know, Latz and white are, excuse me, Scharrer, if I'm saying that correctly, and white are similar and very different from this case and from Latz. And that in both of those cases, the individuals who were in the home had come out. I think Scharrer, four guys walked out backwards and then like laid down, right? White, the guy was arrested 20 feet away from the house. And in white, the government had suggested that Latz, that we should, the Third Circuit should follow Latz. And the white court did not say Latz was wrong. It just distinguished Latz. So something to the extent that Latz's arrest occurred as he moved across the threshold of the home. White was not arrested at or across the threshold of the home or in the area immediately adjacent. We're basically saying that there is some, if you take the immediately adjacent language from prong one, it's simply not consistent with this idea that just outside means anywhere on the outside of the threshold. It's simply inconsistent. And so white where, again, someone was arrested about 20 feet from the house. And there, the Third Circuit applied. They found that the second prong really applied. This case is very different. We're in a- But Scharrer, where the person just stepped outside into the hallway. Well, no, that was not Scharrer. That was Henry, I believe, is the case. I was referring to Henry. What's interesting about Henry, Rob? He approved Henry in Scharrer. I'm sorry? He approved Henry in Scharrer. And I'm quoting to you. I quote, stepped from the apartment into the internal hallway of the building, leaving the door ajar behind him. There's certainly some factual differences between Henry, although it's very similar. There are some factual differences between Henry and between what we have here. But interestingly, if you were to follow Henry, the government prevails on prong two. In Henry, the government prevailed on prong two. So if you were to decide that prong one does not apply here, Henry is compelling. Then I would urge you to follow Henry from the start to the finish and to find that the government survives on prong two. But really, this idea that an arrest can happen right in or just across the threshold and then all of a sudden, through the looking glass, that magically turns into a less dangerous situation. It just doesn't make sense, Your Honor. Yeah, but that's really describing the record here because they knew from their cell phone monitoring that none of the folks who were the subject of this investigation, correct me if I'm wrong, I'm sure you will, have been doing an excellent job of that so far, that none of the folks who were the key here in the OBH group were inside. They knew where they were. They knew that the owner, I can't remember her name now, was not inside. So they had to have something more than a possibility that maybe somebody's in there. They go in there, a reasonable suspicion means nothing. So I don't know that they knew that Janina Miller was not in the apartment. Ms. Matheson said they had to know they were conducting surveillance. I just don't think it's in the record that they knew she left. And actually, I believe that Agent Simpson testified that they thought she might have been in there. And now, and this goes back, I understand several months earlier, there was another search warrant at her apartment and at that point she was cooperative. But in Bowie, the court really talks about how an arrest is the kind of thing that can provoke a violent reaction. So here we have something that is different than just the execution of a search warrant at a house. We have an arrest that is happening in or just outside the threshold of an apartment that opens to a confined hallway with the door still ajar. And prong one of Bowie talks about that the officers have the ability to search those areas immediately adjacent. Well, what could possibly more immediately adjacent from the place where Mr. Blanding was arrested than the living room of the apartment with the door open right in front of them? So for that reason, they were certainly justified to do a protective sweep under prong one. Even if they were not, I submit that they had the reasonable suspicion necessary to do the protective sweep under prong two of Bowie, Your Honor. But again, any error that was here is certainly harmless just based on the very, very minimal amount of data that went from those zones into the record in this case. So I noticed that my red light is off, but I'm... No, no, no, I noticed it back. I have... It's been up for about an hour and a half. Well, Your Honor, I've got television right now, so I'm, but I noticed that that red light was on for a number of people. So I'm going to keep going and you tell me when you don't want to hear from me anymore. So when the sentencing continuance, there is, I understand that we're talking about a case that certainly smells pretty similar to Chapman. And I've got two of the three judges in front of me were on the panel that heard Chapman and sent Chapman back. There are some differences here. I don't want to quibble too greatly about the standard. I think our point was he did not raise anything about the allocution, the need to prepare for allocution in requesting the continuance. For that reason, we suggested plain air. Were it not plain air... From the point of view of the government, wants a fair result, obviously. Yeah. And wants a fair result, including an appropriate sentence. Sure. How was the government injured if the sentencing for Blanding goes back, the judge can impose the same sentence after he hears whatever Blanding has to say, or he can say, geez, I wish I had known that initially and impose what the judge then thinks is a more appropriate sentence. As a sentencing judge who has imposed, I've said hundreds, maybe thousands of sentences, I would want to know everything I could about this guy. I'd want to hear from him. I'd want to hear from his family if his family cares enough to come in. That's really important sentencing information for a judge to have. So you're right. I don't think that we are harmed by that in perfect candor. And frankly, at the time, although I... To our discussion earlier about maybe wishing you said something a little different in the brief, I was going back through the record and preparing for this. And I noticed that at no point did we object to that request for a continuance. The judge, and we say in the brief, he filed a request to continue with it, which the government opposed. I don't think we did oppose it. And... Blend the brief on Zosmer. We're not gonna hold... Yeah, no, no. Well, or maybe the next guy. But it's certainly... I don't know that the government is harmed by that here, to your point. That said, we are... I think there are reasons why this is different than Chapman. The district court here received a motion to continue. He convened a conference call. He went through chapter and verse about, well, when did you meet with him? How many times did you meet with him? When are you gonna meet with him again? That was not the case in Chapman. If I read that record correctly, Chapman showed up at the sentencing hearing and said, hey, I didn't know anything about this. What's going on here? I think the point from Chapman that there's... We wanna avoid the assembly line justice, to your point. We want the right result too. We wanna avoid assembly line... So you have no problem with resentencing? I think it's defendable. And I think that were you to affirm that you would be on solid ground. But no, I don't think that we are harmed by that, Your Honor. I appreciate that. What's that? I appreciate that. Well, I'm... I'm not sure my colleagues do. Trying to be... I'm not sure Zosmer appreciates it. Looking through the back of my... I can feel the gaze through the back of my suit. Yeah, you'll deal with him later on. And so, I think there's ultimately... We wanna avoid assembly line justice, of course. But that's not really what happens here. And if you take it back to, as Ms. Matthewson said, at the time, we're like in a lull coming out of... Or like, I guess, a lull in the COVID pandemic. We'd not been in court a whole lot. We are now 16 months away from a trial. And then four and a half years later, I'm gonna be standing in front of you, having an argument on this. And so, you wanna avoid assembly line justice, for sure. But there is some interest in not granting every single continuance and making sure that those continuances were, in fact, necessary. And ultimately, this is something that's squarely committed to the discretion of the trial court. And here, Judge Bailson convened a conference call. He went through all of the reasons for it, none of which at the time were stated as the need to allocute. And then he came up with the decision that they were gonna move forward, that we're gonna move forward with the continuance. And so, I'd also... There were still other differences with Chapman. You seem, the panel at that time, seemed concerned with the fact that the government arguably violated the plea agreement in that case. And that, I believe, the government's plea agreement, we were to recommend 188 months and then really just recommended the guideline range, which was 188 to 235. And that's not what happened here. Here, we've got... Mr. Blanding was looking at 360 to life. He had an opportunity to address the court after he initially said no. And Judge Bailson said, really, I mean, I would love to hear from you. I'm paraphrasing, of course, but I would love to hear you. Hopefully, I'm paraphrasing well. And it would really help me to hear from you. And at that time, Mr. Blanding did address the court. And Judge Bailson took that into consideration. He took into consideration the fact that Mr. Blanding's criminal history, arguably, which I think was 20 points or something, arguably inflated his actual criminal history. And then he gave him a downward variance. So to that point, it's a little different than Chapman. And so I'll just stay on that. The 851 argument... Can we hold a CAD? Because of Brown? So... You're doing so well on your own. No, no, no, no, just a second there. First week of July is the out of bounds of when we're going to get a decision. I don't think so. I'll follow Ms. Mathieson's lead, and I'm not going to predict anything. But I will say she's absolutely correct that the state law claims at issue here preceded the removal of iulopane from the definition of cocaine, which of course is, at the end of the day, sort of silly that that would change the definition of cocaine. But Brown would likely have an effect. On this case, given when the state law convictions were, I think they were one of 2013, when it was 2014, iulopane was removed in 2015. So they stipulated to this. I understand that there's maybe nothing on the record that sort of affirmatively recognizes that this is an argument out there to be had. This was, although in 2019, four years after iulopane was removed from the definition of cocaine, and they affirmatively stipulated to this at a trial, and that stipulation was presented to the jury, and the jury then found that they were eligible for the sentencing answer. So for that reason, we think it's waived, even if it's not forfeited. We're playing a plain error analysis. For plain error, you've got to show prejudice. You can't show prejudice here. I mean, the mandatory minimum was either 10 or it was 15. And the guidelines were higher. The guidelines were much higher. 360 life, and he ended up getting below the guidelines. So I think the sentence he got is more appropriately viewed as between what Abdul West on one side was likely to get and what Jamil Hickson on the other side was likely to get, not as some happy medium between his guideline range on the one hand and the mandatory minimum on the other, such that reducing the mandatory minimum by five years would have any impact on the court's determination. Thank you. Thank you. We're going to take a break before we hear from Mr. Witherell, and then we'll hear from Ms. Patterson. Take another five-minute break.